IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| United States of America | : | Case No. 1:08-cr-37 |
| | : | |
| v. | : | District Judge Susan J. Dlott |
| | : | |
| Juberto Alfaro | : | ORDER DENYING |
| | : | DEFENDANT'S MOTION TO |
| Defendant | : | SUPPRESS AND MOTION TO |
| | : | SUPPRESS STATEMENTS |

This matter comes before the Court on Defendant Juberto Alfaro's Motion to Suppress (doc. 61) and Motion to Suppress Statements (doc. 62). The Government filed a consolidated response to both motions (doc. 88). The Court held a hearing on the motions on October 1, 2008. For the reasons that follow, the Court **DENIES** Defendant's Motion to Suppress and Motion to Suppress Statements.

I. FACTUAL BACKGROUND

Defendant Juberto Alfaro and five other individuals are charged with conspiracy to possess with intent to distribute and to distribute narcotics in a multi-count indictment stemming from an investigation by the Hamilton County, Ohio Sheriff's Department Regional Narcotics Unit ("RENU"). Defendant Juberto Alfaro was arrested around 10:00 p.m. on Saturday, March 22, 2008 at his home in Edinburg, Texas, by Drug Enforcement Administration ("DEA") agents from the McAllen, Texas Division and Hamilton County, Ohio RENU agents. DEA Agent Anthony Dominguez served Alfaro with arrest warrants for drug trafficking and conspiracy that

1

had been issued earlier that day by a judge in Hamilton County, Ohio, and that had been faxed from Ohio to Texas that afternoon. (Gov't Ex. 4, 4a-b.) Agent Dominguez then obtained written consent from Alfaro to search his residence. (Gov't Ex. 5.) During the search, officers seized cellular phones, a video tape, and miscellaneous paperwork listing estimated amounts of currency and numerous telephone numbers for Chicago, Ohio, and Mexico. (Gov't Exs. 6-6v, 7.) The following Monday, March 24, 2008, while Alfaro was in custody, Agent Dominguez interviewed Alfaro, and Alfaro confessed to his involvement in an illegal drug trafficking scheme. (Gov't Ex. 8.)

Alfaro filed two motions to suppress. Both are general requests for the suppression of evidence and neither contains any discussion of the law. With the first, the Motion to Suppress, Alfaro seeks suppression of "all evidence seized as the result of a search of the defendant and his home and all statements either written or oral made after the arrest of the defendant." (Doc. 61.) With the second, the Motion to Suppress Statements, Alfaro asks that the "illegally obtained statements from the Defendant be suppressed." (Doc. 62.) The only relevant statements this Court is aware of were made by Alfaro during the March 24, 2008 interview. Two officers, RENU Agent Steven Lawson and DEA Agent Dominguez, testified at the suppression hearing. The relevant facts, gleaned largely from the two officers' testimony, are as follows:

### A. The Investigation and Arrest Warrants

In or around the fall of 2007, RENU agents began investigating an organization they suspected was responsible for distributing cocaine and heroin throughout the greater Cincinnati area. Through this investigation, Cincinnati Police Officer and RENU Agent Steven Lawson began working with a confidential informant in November 2007 to determine who was supplying

the cocaine and heroin. The confidential informant identified "Juverto Alfaro," who had the aliases "Tio" and "Frank," as a supplier. The informant met in person with Alfaro in Cincinnati and participated in hundreds of recorded telephone conversations with Alfaro regarding the delivery, quantity, and price of cocaine and other narcotics.[1] In these calls, Alfaro and the informant discussed money owed by the informant to Alfaro for previous narcotics delivered to the Cincinnati area on consignment and future deliveries of narcotics. (<u>See</u> Gov't Ex. 1-1e.)[2]

The Government played a number of the recorded conversations at the suppression hearing. In a January 8, 2008 conversation, Alfaro and the informant discussed a man named "Felipe." (Gov't Ex. 1.) Agent Lawson testified that he understood "Felipe" to be Felipe Reyes, one of the co-defendants in this case. In a conversation recorded March 1, 2008, Alfaro and the informant discussed a delivery of narcotics by Felipe to the informant in Cincinnati that was to take place within only a few hours. (Gov't Ex. 1a.) Consistent with that conversation, Reyes delivered narcotics to the informant on March 1, 2008. Based on the content of the hundreds of recorded telephone conversations, Agent Lawson understood Felipe Reyes to be acting at the control of Alfaro.[3]

---

[1] At the suppression hearing, Agent Lawson testified that RENU provided the informant with the recording equipment and that the informant recorded conversations with Alfaro in a controlled area. The informant informed Agent Lawson that the voice in the recordings was Alfaro's.

[2] These exhibits are electronic audio files of six of the recorded phone calls. Agent Lawson identified the voices on the recording to be those of Alfaro and the informant.

[3] The Government played four additional conversations that took place shortly before Alfaro was arrested. (<u>See</u> Gov't Exs. 1b-1e.) The first was a recording of a phone call between the informant and Alfaro on March 15, 2008, in which Alfaro and the informant discussed another upcoming delivery of narcotics to Cincinnati. The three other conversations were also phone calls between Alfaro in Texas and the confidential informant in Cincinnati recorded on March 21 and 22, 2008.

Throughout the investigation, Agent Lawson shared information with other officers involved in the investigation. At some point, the officers concluded that Alfaro was residing at 2694 Easy St. in Edinburg, Texas. Agent Lawson traveled to Texas on March 17 or 18, 2008,[4] five or six days prior to Alfaro's arrest. Once there, Lawson contacted DEA agents, including Agent Dominguez, from the McAllen, Texas DEA about the narcotics investigation. Agent Lawson also remained in contact with fellow Hamilton County RENU agents.

On March 18, 2008, while Agent Lawson was still in Texas, RENU Agent William Crock filed in the Hamilton County, Ohio Municipal Court three complaints against Alfaro for conspiracy and drug trafficking of heroin and cocaine. Each of the three complaints included a sworn statement by Agent Crock that was notarized on March 18, 2008. The recorded telephone calls and the March 1, 2008 delivery of narcotics to the informant in Cincinnati provided the basis for Agent Crock's sworn statements. However, Agent Crock did not reference the confidential informant, any of the recorded telephone conversations, or the narcotics delivery in the statements. Rather, the complaints state in relevant part the following:[5]

(a) The Conspiracy Complaint

AGENT WILLIAM CROCK JR Being first duly cautioned and sworn, Deposes and says that JUVERTO ALFARO On or about MARCH 1, 2008 in Hamilton County and State of Ohio, Did knowingly * COMMIT the commission of ** DRUG TRAFFICKING Contrary to and in violation of Section 2923.01 Revised Code of Ohio, A Felony of the 1ST degree. The complainant states that this complaint is based on JUVERTO ALFARO CONSPIRING AND PLANNING WITH ANOTHER TO TRAFFIC IN HEROIN AND COCAINE.

---

[4] Agent Lawson testified that he arrived in Texas on Monday or Tuesday the week of Alfaro's arrest. The Monday preceding Alfaro's arrest was March 17, 2008.

[5] The Court reproduces Agent Crock's sworn statements as they appeared in the original complaints. The Court retained the original spelling and capitalization of letters.

(Gov't Ex. 4.)

    (b) The Cocaine Trafficking Complaint

    Agent William Crock Jr being first duly cautioned and sworn, deposes and says that Juverto Alffaro on or about March 1, 2008, in Hamilton County and State of Ohio, did knowingly sell a schedule *II controlled substance to wit: cocaine in an amount weighing more then 1000 grams. As defined in 2925.01 of the Revised Code of Ohio, contrary to and in violation of Section 2925.11 Revised Code of Ohio, a Felony of the1st degree. The complainant states that this complaint is based on Juverto Alfaro did knowingly sell another over 1000 grams of cocaine.

(Gov't Ex. 4a.)

    (c) The Heroin Trafficking Complaint

    Agent William Crock Jr. being first duly cautioned and sworn, deposes and says that Juverto Alfaro on or about March 1, 2008, in Hamilton County and State of Ohio, did knowingly sell a schedule *I controlled substance to wit: Heroin in an amount weighing more than 250 grams As defined in 2925.01 of the Revised Code of Ohio, contrary to and in violation of Section 2925.11 Revised Code of Ohio, a Felony of the1st degree. The complainant states that this complaint is based on Juverto Alfaro did knowingly sell another over 250 grams of heroin.

(Gov't Ex. 4b.)

On March 22, 2008, a Hamilton County judge issued three arrest warrants for "Juverto Alfaro of 2694 Easy St. Edingberg Texas 48539." (Gov't Exs. 4, 4 (a-b).) There is no evidence that the judge relied upon anything other than the complaints in issuing the warrants.

On the afternoon of March 22, 2008, the arrest warrants were faxed to the DEA office in McAllen, Texas and given to Agent Lawson.

### B. The Arrest of Alfaro and Search of His Residence

Agent Lawson showed the warrants and complaints to the DEA Agents assisting him in Texas and shared details of the investigation, including information about the confidential informant's contacts with Alfaro. Agent Lawson, DEA Agent Dominquez, and other agents of

the McAllen, Texas DEA and Edinburg law enforcement then proceeded to Alfaro's residence to conduct surveillance.

At approximately 10:00 p.m. on March 22, 2008, the officers approached Alfaro's house to arrest him. Agent Dominguez testified that eight uniformed officers were present during the arrest. The officers were armed but never drew their weapons. A uniformed officer from the Edinburg Police Department made first contact, knocking on the front door of the 2864 Easy St. residence. When an individual other than Alfaro opened the front door, Agent Dominguez asked to speak to Alfaro. Alfaro then came to the door and Agent Dominguez advised him in Spanish[6] of the charges he faced in Ohio and informed him there was a warrant for his arrest.

Agent Dominguez testified that after he advised Alfaro of the warrant, he read Alfaro Miranda warnings in Spanish from DEA form 13-A, a two-sided card the McAllen DEA uses when administering Miranda warnings. (Gov't. Exs. 9, 9a.) Alfaro indicated that he understood his rights. Agent Dominguez then asked Alfaro if he was willing to answer questions. Alfaro responded that he did not know anything. At that point, Agent Dominguez sought Alfaro's consent to search his residence. Agent Dominguez gave Alfaro a form written in Spanish and bearing the title "Consentimiento Para Hacer Registro." (Gov't. Ex. 5.) Agent Dominguez orally explained to Alfaro in Spanish that by signing the form, Alfaro was authorizing the agents to search his house. Alfaro signed the form, and Agent Dominguez and Carlos Mirles, a Spanish-speaking DEA agent, witnessed Alfaro's signature.

During the search of Alfaro's residence, DEA Agent Suzanne Richards seized items she

---

[6] Agent Dominguez spoke fluent Spanish. Of the eight officers present, three or four were non-Spanish speaking.

believed to be used in drug trafficking: thirteen cellular phones, a video tape, and miscellaneous paperwork with estimated amounts of currency and numerous telephone numbers to Chicago, Ohio, and Mexico listed on them. Alfaro signed the list of items seized by the agent. (Gov't Ex. 7.) Edinburg local law enforcement then took Alfaro into custody. At some point in the evening, officers also removed from the house a woman, whom Alfaro claims was his wife, and a small child who were present in the house at that time Alfaro was arrested. Following the arrest and search, Agent Lawson flew back to Cincinnati, and Alfaro remained in the custody of Edinburg law enforcement.

### C. Statements Provided After Arrest

On the morning of March 24, 2008, following the arrest, Edinburg police contacted Agent Dominguez because Alfaro asked to speak with him. Agent Dominguez agreed to meet with Alfaro and brought with him DEA Agent Shannon Sears. Upon first meeting with Alfaro, Agent Dominguez orally advised Alfaro of his Miranda rights in Spanish. Alfaro proceeded to speak with Agent Dominguez for thirty to forty-five minutes. Agent Dominguez testified that at no time during the interview did Alfaro request an attorney. During that interview, Alfaro made several statements implicating himself and others in the trafficking and sale of narcotics. (See Gov't Ex. 8.)

Also on Monday, May 24, 2008, Alfaro made his initial appearance in the United States District Court, Southern District of Texas (McAllen). (See Def. Ex. F.) The docket sheet reflects that at that appearance, Alfaro requested appointed counsel, a request the judge denied. (Id.) It is unclear from the record whether Alfaro's initial appearance occurred before or after Alfaro's meeting with Agent Dominguez.

After obtaining the statement from Alfaro, Agent Dominguez contacted RENU agents in Cincinnati. Agent Lawson met with federal prosecutors and, on Monday, March 24, 2008, Agent Lawson executed a detailed affidavit and filed a criminal complaint against Alfaro in the United States District Court for the Southern District of Ohio. (Doc. 1.)

## II. ANALYSIS

The evidence Alfaro seeks to suppress falls primarily into the following two categories: (1) the items seized during the search of his residence on March 22, 2008, and (2) the statements he provided to Agent Dominguez on March 24, 2008, two days after his arrest. The Court addresses the evidence in that order.

### A. Evidence Obtained During the Search of Alfaro's Residence

Alfaro argues that his arrest and the subsequent search of his residence were improper and therefore the evidence seized during the search must be suppressed as fruit of the poisonous tree. The Government responds that the arrest was proper and that Alfaro gave consent to search his house. The Court must determine first whether the arrest was constitutional. If the arrest is found to have violated Alfaro's rights, the Court must then determine whether the unconstitutional arrest so tainted Alfaro's consent as to warrant suppression of the evidence seized during the search.

#### 1. Constitutionality of the Arrest

The validity of Alfaro's arrest is governed by the Fourth Amendment's guarantee of

freedom from unlawful searches and seizures.[7] As indicated above, the officers in this case arrested Alfaro pursuant to arrest warrants issued by the Hamilton County, Ohio Municipal Court. (Gov't Exs. 4-4b.) Defendant Alfaro attacks the warrants on two grounds. Alfaro first argues that the arrest warrants, and as a result his arrest, were not supported by probable cause. Next, Alfaro argues that officers were not entitled to rely on the warrants when arresting him in Texas because the warrants were issued by an Ohio state court. The Government responds that the arrest warrants were supported by probable cause and that even without the warrants the officers had sufficient probable cause to arrest Alfaro.

### a. Arrest Warrant

As to the first ground, Defendant argues that the affidavit supporting the warrant was insufficient to establish probable cause.[8] The Supreme Court has long held that "before a warrant for either arrest or search can issue . . . the judicial officer issuing such a warrant [must] be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant." Whiteley v. Warden, 401 U.S. 560, 564 (1971). In making a probable cause determination, the judicial officer's "action cannot be a mere ratification of the bare conclusion of others." Illinois v. Gates, 462 U.S. 213, 239 (1983), quoted in United States v.

---

[7] The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV.

[8] The Supreme Court has defined "probable cause" as the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979).

9

Weaver, 99 F.3d 1372, 1377 (1996). Affidavits containing only conclusory statements give the judicial officer "no basis at all for making a judgment regarding probable cause." Id.; see also United States v. Leon, 468 U.S. 897, 915 (1984); United States v. McPhearson, 469 F.3d 518, 525-26 (2006).

Particularly instructive on this matter is Whiteley, 401 U.S. at 563-65, in which the Supreme Court held that a complaint similar to the complaints filed in the instant case was not sufficient to support a warrant. In Whiteley, a Sheriff was investigating several related break-ins in Saratoga, Wyoming. Acting on a tip, the Sheriff filed a criminal complaint charging the defendant and another individual with breaking and entering a building identified as the Rustic Bar. Id. at 562-63. The complaint stated as follows:

> I, C. W. Ogburn, do solemnly swear that on or about the 23 day of November, A.D. 1964, in the County of Carbon and State of Wyoming, the said Harold Whiteley and Jack Daley, defendants did then and there unlawfully break and enter a locked and sealed building (describing the location and ownership of the building).

Id. at 563. A judge issued an arrest warrant based on the complaint and the sheriff put out a radio bulletin indicated that a warrant had been issued for the two suspects. Id. at 563-64. The defendant was then arrested.

In holding that the Sheriff's complaint was insufficient to support the arrest warrant, the Whiteley Court noted as follows:

> [T]he sole support for the arrest warrant issued at Sheriff Ogburn's request was the complaint reproduced above. That complaint consists of nothing more than the complainant's conclusion that the individuals named therein perpetrated the offense described in the complaint. The actual basis for Sheriff Ogburn's conclusion was an informer's tip, but that fact, as well as every other operative fact, is omitted from the complaint. Under the case just cited, that document alone could not support the independent judgment of a disinterested magistrate.

10

Id. at 565.

More recently, another court in this district followed the tenets of Whiteley in Webb v. Greene County Sheriff's Office, 494 F. Supp. 2d 779, (S.D. Ohio 2007) (Rice, J.), a civil rights case stemming from an arrest based upon an allegedly invalid warrant. In Webb, a police officer investigating a woman's claim that someone had stolen the license plates from her car discovered information implicating the plaintiff, the operator of an auto repair shop where the woman had taken her car for repairs. Id. at 783-83. The officer swore a complaint and affidavit and obtained an arrest warrant for Webb. The complaint and affidavit, which were together a single document similar to the complaints in the instant case, contained only a few conclusory statements charging Webb with one count of receiving stolen property and one count of theft. Id. at 784. Citing Whiteley, the court characterized the language of the complaint and affidavit as "bare bones," id. at 792, and noted that complaints that recite "only the applicable statutory language, with the appropriate name, date and location inserted therein," are "insufficient to support a facially valid arrest warrant." Id. at 789.

The complaints sworn to by Officer Crock in the instant case are precisely that type of complaint. They contain nothing more than a single-line conclusory description, including the date and location of the alleged crimes, charging Alfaro with conspiracy to traffic narcotics and with the sale of heroin and cocaine. Had all of the facts described above, including the numerous recorded conversations between the confidential informant and Alfaro and the details of the March 1, 2008 drug transaction, been included in an affidavit, that affidavit would indeed have been sufficient to support the issuance of a warrant. However, that information was not included in the sworn complaints filed by Agent Crock and there is no evidence that Agent

11

Crock advised the warrant issuing judge of that information or that the judge relied upon anything other than the complaints in issuing the arrest warrants.[9] The Court therefore finds that the warrants relied upon by the officers who arrested Alfaro were invalid.[10]

### b. Warrantless Arrest

Having determined that the arrest warrants in this case were not supported by probable cause, the Court next addresses the legality of Alfaro's arrest absent the warrants. Indeed, the absence of a warrant does not always render an arrest unconstitutional. For example when the arrest occurs in a public place, probable cause alone is sufficient to justify a warrantless felony arrest. United States v. Watson, 423 U.S. 411, 427 (1976). Based on the facts known to Agent Dominguez and Agent Lawson at the time of the arrest, the Court finds that the officers did have probable cause to arrest Alfaro for his participation in the alleged drug trafficking conspiracy. However, because the arrest occurred at Alfaro's home, it is unclear whether probable cause alone was sufficient to justify his arrest.

The Supreme Court has held that even where probable cause exists, officers may not enter an individual's home or residence to effect a warrantless arrest or search in the absence of exigent circumstances. Payton v. New York, 445 U.S. 573, 590 (1980). The instant cases falls into the category of cases dealing with "threshold arrests," or arrests that take place when the individual is standing at or slightly within the threshold of the home. United States v. Saari, 88

---

[9] Agent Crock did not testify at the suppression hearing and little evidence was presented as to his application for the arrest warrants.

[10] At the suppression hearing, Alfaro devoted a significant amount of argument to the premise that the arrest was improper pursuant to Federal R. Crim. P. 41, arguing that DEA officers could not rely on warrants issued by a state court judge in Ohio when arresting Alfaro in Texas. The Court's determination that the warrants are invalid renders this issue moot.

F. Supp. 2d 835, 840 (W.D. Tenn. 1999). The legality of these types of arrests remains unsettled and the determination of whether a threshold arrest amounts to a Payton violation is often highly fact driven. The Sixth Circuit has never addressed the specific scenario presented in this case, though it has suggested that such an arrest would violate Payton. See United States v. Morgan, 743 F.2d 1158, 1166 (6th Cir. 1984)[11] (adopting the rule that "the important consideration in this type of case is the location of the arrested person, and not the arresting agent, that determines whether an arrest occurs within a home"); United States v. Bradley, 922 F.2d 1290, 1294-95 (6th Cir. 1991), overruled on other grounds by United States v. McGlocklin, 8 F.3d 1037, 1047 (6th Cir.1993) (analyzing a similar arrest under Tennessee and federal law).

---

[11] At two different points in the Morgan opinion, the Sixth Circuit indicated in dicta that it did not believe the warrantless arrest of an individual standing in his or her doorway would be permissible under Payton. Id. at 1165, 1166 n. 2. First, addressing United States v. Herring, 582 F.2d 535 (10th Cir. 1978), the court stated:
> Herring involved the peaceful arrest of a suspect outside of his motel as he responded to the knocks of the arresting officers. . . . to the extent that the Herring court validates the warrantless arrest of an individual standing in the doorway of a private residence absent exigent circumstances, we believe the rule of Payton v. New York, would compel a contrary result had Herring been decided subsequent to the Payton decision.

Id. at 1165. The court then indicated its disagreement with Ninth Circuit case law regarding threshold arrests as follows:
> In United States v. Whitten, 706 F.2d 1000, 1015 (9th Cir. 1983), cert. denied, 465 U.S. 1100, 104 S. Ct. 1593, 80 L. Ed. 2d 125 (1984), and United States v. Botero, 589 F.2d 430, 432 (9th Cir. 1978), cert. denied, 441 U.S. 944, 99 S. Ct. 2162, 60 L. Ed. 2d 1045 (1979), the Ninth Circuit has interpreted United States v. Santana, 427 U.S. 38, 96 S. Ct. 2406, 49 L. Ed. 2d 300 (1976), to allow the warrantless arrest of an individual as he stands in the doorway of a private residence. However, in Botero the court found sufficient exigency to justify the warrantless entry and arrest of the defendant. United States v. Botero, 589 F.2d at 432. To the extent that Whitten validates the warrantless arrest of individuals standing in the doorway of a private residence absent exigent circumstances, we believe that this holding is contrary to the rule established in Payton.

Id. at 1166 n. 2.

13

This Court need not determine whether Alfaro's arrest fell within the parameters of Payton, thereby requiring more than just probable cause, because the Court finds below that even assuming Alfaro's arrest was illegal, the evidence seized from Alfaro's house need not be excluded under the exclusionary rule.

### 2. Exclusion of the Evidence Found in Alfaro's House

Even assuming that Alfaro's arrest was unconstitutional, there is no per se rule that evidence obtained in violation of the Fourth Amendment must be excluded. Indeed, the Supreme Court recognizes that "[t]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands, and an examination of its origin and purposes makes clear that the use of fruits of a past unlawful search or seizure 'work[s] no new Fourth Amendment wrong.'" United States v. Leon, 468 U.S. 897, 906 (1984) (quoting United States v. Calandra, 414 U.S. 338, 354 (1974)). "[T]he exclusionary rule is neither intended nor able to cure the invasion of the defendant's rights which he has already suffered." Id. (internal quotation omitted). Rather, the rule "operates as a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." Id. (internal quotation omitted). Thus in applying the exclusionary rule, courts must always consider whether the deterrent effect justifies the cost of excluding the evidence. See Leon, 468 U.S. at 910-11; Hudson v. Michigan, 547 U.S. 586, 591 (2006).

To determine whether the evidence seized from Alfaro's house should be excluded, the Court must determine whether the search of Alfaro's house was sufficiently attenuated from his illegal arrest that the purpose of the exclusionary rule would not be served by excluding the

evidence seized during the search.  There are two ways in which attenuation can occur.  First, the evidence need not be excluded if the Court finds that: (1) Alfaro's consent was voluntary and (2) the causal chain between the consent and the illegal seizure is broken.  See <u>United State v. Lopez-Arias</u>, 344 F.3d 623, 629 (2003); <u>United States v. Henderson</u>, 488 F. Supp. 2d 648, 652 (N.D. Ohio 2007).  Second, the Supreme Court recently indicated that attenuation may also occur when, "even given a direct causal connection, the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." <u>Hudson</u>, 547 U.S. at 593.  Under either analysis, the Court finds that Alfaro's consent was attenuated from his arrest.

As to the first form of attenuation, the Court first finds from the totality of the circumstances that consent was entered into freely and voluntarily.  See <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 227 (1973) (whether consent is entered into voluntarily is "a question of fact to be determined from the totality of all the circumstances").  The burden lies with the Government to demonstrate that the consent results from "an essentially free and unconstrained choice by its maker."  <u>Id.</u> at 225.  The officers' testimony in the instant case showed that Agent Dominguez read Alfaro his <u>Miranda</u> rights prior to asking for his written consent to search the house and that Alfaro indicated he understood his rights.  There is no evidence that Alfaro was under duress at that time or that his consent was the result of coercion.  At the suppression hearing, counsel for Alfaro argued that Alfaro signed the consent form only because the agents threatened to take away his family and his home.  However, Agent Dominguez testified that he did not threaten Alfaro in that manner.  There is no evidence to contradict Agent Dominguez's testimony and the Court found his statements credible.

15

Alfaro's counsel also argued that the consent form Alfaro signed was misleading, suggesting that the Spanish form contained a translation error that rendered Alfaro's consent unknowing or involuntary. Specifically, defendant's counsel, who speaks Spanish, objected to the use of the word "Registro" in the title of the DEA consent to search form, which he asserted in Spanish could mean to "to register", rather than "to search." When considering the effect of a potential translation error in the introductory paragraph of a consent to search form, the Sixth Circuit looks beyond specific words to the entirety of the form to assess the form's adequacy. United States v. Lopez-Medina, 461 F.3d 724 (6th Cir. 2006). The testimony in this case indicates that Alfaro was provided the consent form to review and given sufficient opportunity to read it before signing. See id. at 738 (noting that "there is no dispute that [the defendant] was provided the entire form to review and given sufficient opportunity to read as much as he wanted before signing"). Agent Dominguez testified that the form used was a standard form used by the DEA McAllen Division, and he reviewed each question on the form with Alfaro in Spanish. Dominguez asked Alfaro if there was anything about the form Alfaro did not understand. He informed Alfaro that by signing the form, he authorized a search of his residence. Alfaro said he understood the form. The signature of Carlos Mirles, a Spanish-speaking DEA agent, appears on the form as witnessing it. Based on the totality of the circumstances, the Court finds Alfaro's consent to be valid.

The Court also finds that the causal chain between Alfaro's consent and his illegal arrest was broken. "To determine whether a consent to search was sufficiently attenuated from an illegal seizure such that the causal chain was broken, courts must consider factors such as the length of time between the illegal seizure and the consent, the presence of intervening

circumstances, the purpose and flagrancy of the official misconduct, and whether the officers read the suspect his Miranda rights before he consented." United States v. Lopez-Arias, 344 F.3d 623, 630 (6th Cir. 2003).

Considering these factors, the Court notes that there were no significant intervening circumstances in the instant case. Nor did a significant amount of time pass between Alfaro's arrest and his grant of consent. However, the Court finds that in the instant case, the remaining two factors tilt the scales toward finding that the causal chain was broken. First, Alfaro was read his Miranda rights prior to consenting to the search and that Alfaro indicated that he understood those rights. Second, as to the flagrancy of the misconduct, the Court finds that the officers did not act with a blatant disregard for the law. The arresting officers relied upon warrants approved by a judicial officer in Ohio. The arresting officers were not present when the warrants were secured, and therefore had no idea what Officer Crock stated to the judge when applying for the warrants or whether any affidavits separate from the complaints were provided. Instead, they believed that they had probable cause to arrest Alfaro and that valid warrants had been secured. As such, the officers were entitled to rely upon the warrants in good faith and the arrest of Alfaro was not an egregious violation of his rights.

Turning to the second form of attenuation, the Court finds that interests protected by the warrant requirement would not be served by suppressing the evidence in this case. The interest protected by the warrant requirement in this case is the interest in ensuring that officers do not arrest individuals absent probable cause. There is abundant evidence in this case supporting the existence of probable cause. It is unfortunate that the information did not make it into Officer Crock's warrant applications. However, the Court finds that suppression of the evidence found in Alfaro's house is not warranted in this case.

17

### B. Evidence Obtained During the March 24, 2008 Interview

Alfaro also moves for the suppression of the statements he made to Agents Dominguez and Sears on March 24, 2008, arguing that the statements were tainted by his illegal arrest and that they were made involuntarily. (See doc. 61, 62). As to the first argument, the Court finds that these statements are sufficiently attenuated from Alfaro's illegal arrest. Alfaro made these statements more than two days after he had been taken into custody. Moreover, the agents did not initiate the interview with Alfaro. Rather, the agents only met with him because Alfaro requested to speak with Agent Dominguez. The Supreme Court has previously held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the [government's] use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of Payton." New York v. Harris, 495 US 14, 21 (1990). Based on Harris, the Court finds that Alfaro's statements need not be suppressed as a fruit of his illegal arrest.

Alfaro next argues that his statements should be suppressed as involuntary. As indicated above, the determination of whether consent was entered into freely and voluntarily is "a question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S. at 227. Factors that the Court may consider includes evidence of minimal schooling, low intelligence, and lack of any effective warnings to person of his rights, as well as evidence concerning the length of detention, repeated and prolonged nature of questioning, and use of physical punishment such as deprivation of food or sleep. United States v. Crowder, 62 F.3d 782 (6th Cir. 1995).

None of these factors indicate that Alfaro did not make his statements freely and voluntarily. Alfaro is approximately fifty-four years old. There is no evidence to suggest Alfaro

18

is illiterate or had below-average intelligence. The officers read Alfaro his rights in Spanish both upon his arrest and prior to speaking with him on March 24. Alfaro indicated that he understood those rights. Nonetheless Alfaro agreed to speak with Officers Dominguez and Sears. Alfaro's detention was not abnormally long. Nor was his meeting with the agents abnormally long. The meeting lasted only thirty to forty-five minutes and there is no indication that the agents questioned Alfaro in a repetitive manner. Finally, there is no evidence that Alfaro was physically punished or deprived of basic needs. After considering the totality of the circumstances, the Court finds that the statements Alfaro made during the March 24, 2008 interview were freely and voluntarily made.

**III.    CONCLUSION**

For the reasons stated above, the Court **DENIES** Defendant's Motion to Suppress (doc. 61) and Defendant's Motion to Suppress Statements (doc. 62). The statements made by Alfaro on March 24, 2008 during his meeting with DEA agents are admissible.

IT IS SO ORDERED.

            ___s/Susan J. Dlott_____
            Judge Susan J. Dlott
            United States District Court